MINNESOTA ENERGY AND ECONOM-
IC DEVELOPMENT AUTHORITY,
Respondent,

v.

David L. PRINTY, as Secretary of the
Minnesota Energy and Economic De-
velopment Authority, Appellant.

No. CX–84–399.

Supreme Court of Minnesota.

May 11, 1984.

Lindquist & Vennum, R. Walter Bachman, and James P. McCarthy, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Christie B. Eller and Barry R. Greller, Sp. Asst. Attys. Gen., St. Paul, for respondent.

## ORDER

SCOTT, Justice.

IT IS ORDERED that:

The order filed herein on May 4, 1984, is hereby withdrawn, and the following order is substituted:

1. The judgment of the Hennepin County District Court, the Honorable David R. Leslie, entered February 27, 1984, be, and the same is, affirmed;

2. The findings of fact, conclusions of law, order for judgment, and the memorandum of the Hennepin County District Court, the Honorable David R. Leslie, filed February 27, 1984, attached hereto and incorporated herein, are adopted as the opinion of this court.

STATE OF MINNESOTA
COUNTY OF HENNEPIN

DISTRICT COURT
FOURTH JUDICIAL DISTRICT

Court File No. MC84–347

Minnesota Energy and Economic Development Authority, an Agency of the State of Minnesota,

Plaintiff,

vs.

David L. Printy, as Secretary of the Minnesota Energy and Economic Development Authority,

Defendant.

FINDINGS OF FACT,
CONCLUSIONS OF LAW
AND ORDER FOR JUDGMENT

DAVID R. LESLIE, Judge.

This matter came on for hearing before the undersigned on February 23, 1984, upon the parties' separate motions for summary judgment. The plaintiff was represented by Barry R. Greller and Christie B. Eller, Special Assistant Attorneys General. The defendant was represented by R. Walter Bachman, Esq. and James P. McCarthy, Esq. of the firm of Lindquist and Vennum. Based upon the oral argument of counsel and upon all the pleadings, affidavits, ex-

hibits, stipulation, files and records and proceedings herein, the Court makes the following determinations.

## FINDINGS OF FACT

### The Authority and the Act

1. The Minnesota Energy and Economic Development Authority (hereinafter "the Authority") is a public agency of the State of Minnesota created by Minn.Laws 1983 ch. 289 (codified as Minn.Stat. §§ 116J.875 to 116J.926 and hereinafter referred to as "the Act"). The Authority is the legal successor to the Minnesota Small Business Finance Agency created by Minn.Laws 1980 ch. 547 as amended.

2. The members and governing body of the Authority consist of the Commissioner of the Department of Energy and Economic Development (hereinafter "the Department") and ten individuals appointed by the Governor. (Minn.Stat. § 116J.89, subd. 8 (Supp.1983)).

3. The Governor appoints the Chairman of the Authority (Minn.Stat. § 116J.89, subd. 8 (Supp.1983)). In August, 1983, Mark B. Dayton, the Commissioner of the Department, was duly appointed as Chairman of the Authority.

4. The Commissioner of the Department is required to appoint staff as necessary for the administration of the Authority. (Minn.Stat. § 116J.89, subd. 10 (Supp. 1983)). The Financial Management Division of the Department provides staff, performs credit checks, financial analysis and other duties as required by the Authority. Affidavit of M. Jean Laubach.

5. The Act was passed to promote the welfare and prosperity of the State by maintaining and increasing the career and job opportunities of its citizens; by reducing, controlling, and preventing environmental pollution and waste of resources; and by protecting and enhancing the tax base on which state and local governments depend for the financing of public services. (Minn.Stat. § 116J.89, subd. 2 (1982), as amended by Minn.Laws 1983 ch. 289 § 74).

6. The Authority is empowered to issue bonds, implement loan programs, insure loans and provide financial assistance as a partnership between the public and private sectors, for the public purposes of:

(a) providing financial assistance to eligible small businesses for projects on sufficiently favorable terms to assist and encourage the establishment, maintenance and growth of small businesses and employment opportunities in Minnesota;

(b) providing financial assistance to eligible small businesses for projects which will help prevent, reduce, abate or control noise, air or water pollution or contamination; and

(c) providing financial assistance to promote the conservation of energy, the reduction of the uses of conventional fuels as a source of energy, and the development of alternative and renewable energy resources.

(Minn.Stat. §§ 116J.875, 116J.89 and 116J.921).

7. The Authority is empowered by the Act to issue and sell bonds and to use the proceeds to make loans to eligible small businesses for business development projects, pollution control projects and qualified energy projects (Minn.Stat. §§ 116J.90, 116J.91 and 116J.925).

8. Neither the State of Minnesota nor any agency or political subdivision of the State is liable on any bonds issued by the Authority, and such bonds do not constitute a debt or loan of credit of the State. Therefore, neither the full faith and credit nor the taxing power of the State is pledged to the repayment of such bonds. (Minn.Stat. § 116J.89, subd. 3.)

9. Minn.Stat. § 116J.89, subd. 1c creates the economic development fund and provides that all money in the fund is appropriated to the Authority to accomplish the Authority's business development and pollution control purposes. Minn.Laws 1983 ch. 301 § 28 appropriated $15,000,000 to the economic development fund.

10. Minn.Stat. § 116J.925, subd. 3 creates the energy development fund and pro-

vides that the Authority may use the fund in connection with bonds issued to make loans for qualified energy projects. Minn. Laws 1983 ch. 301 § 28 appropriated $1,800,000 to the energy development fund.

11. The Authority is empowered by the Act to issue and sell bonds and to use the proceeds to make loans to eligible small businesses for business development projects (Minn.Stat. §§ 116J.90 and 116J.91).

12. The Authority is empowered by the Act to insure loans made to eligible borrowers by private lending institutions for qualified energy projects (Minn.Stat. § 116J.924). Minn.Stat. § 116J.924, subd. 2 creates the energy loan insurance fund and provides that the Authority may use the fund in connection with insurance of such loans. Minn.Laws 1983 ch. 301 § 28 appropriated $7,500,000 to the energy loan insurance fund.

13. In an effort to meet the needs of Minnesota businesses for financing, the Authority established three pilot programs pursuant to Minn.Stat. §§ 116J.875 to 116J.926 (1982 & Supp.1983). These programs are: the Business Loan Bond Insurance Pilot Program, the Energy Development Loan Pilot Program; and the Energy Loan Insurance Pilot Program. Dayton Aff.

*The Business Loan Bond Insurance Pilot Program*

14. The Business Loan Bond Insurance Pilot Program was created pursuant to Minn.Stat. §§ 116J.875 to 116J.91 (1982 & Supp.1983). It is intended to provide "business loans" to "eligible small businesses" located in Minnesota which are starting or expanding and are creating new jobs and/or installing or improving equipment or facilities to control pollution. Loans may also be made to assist businesses which would otherwise reduce their employment or other activities within Minnesota without the financing provided by the program. Dayton Aff.; Laubach Aff.; Exs. K, K–1, L.

15. Funds for business loans primarily will be raised through the sale of revenue bonds issued by the Authority, the interest on which is generally exempt from federal income taxes. These debt instruments will generally take the form of long term, fixed rate loans for land, buildings, capital improvements or equipment. Business development loans generally will be provided at interest rates below those normally available to the small business. By pooling bond issues and increasing the investment of private capital in connection with business loans, the Authority's program facilitates a partnership between the private and public sectors. Ex. K–1.

16. Additional security for the business loan bonds will be provided through the use of appropriated dollars in the Economic Development Fund either (1) to purchase private bond insurance and/or to fund a debt service reserve fund to be used in conjunction with the private bond insurance, or (2) through segregated accounts within the Economic Development Fund pledged to each loan made under the Program. By so securing the bond issue, it will be possible to provide financial assistance to small businesses which otherwise would be unable to receive financing at all or only at such unfavorable terms or conditions as to make their projects not economically feasible. Ex. K–1.

17. Ultimate approval of an application for a loan under the Business Development Loan Bond Insurance Pilot Program will depend upon a determination that the business entity applying for a loan is creditworthy under generally accepted commercial lending credit evaluation practices, that the financial analysis of the business's performance shows it is adequate to reasonably assure that the loan will be repaid, and that the State of Minnesota will benefit in the form of new jobs created, expanded state or local tax bases, improvement of economic activities in depressed areas of the State, other economic and employment benefits, or pollution abatement or other environmental enhancements. Ex. K–1; Dayton Aff.; Laubach Aff.

18. The Business Loan Rules previously adopted by the Small Business Finance Agency were transferred to the Authority, as successor to the Small Business Finance Agency. These rules are set forth in 4 MCAR §§ 14.001–14.023. Ex. J.; Dayton Aff.

19. According to the procedural guides for the three pilot programs set up by the Authority, an extensive credit check must be performed on each applicant. The Financial Management Division of the Minnesota Department of Energy and Economic Development is responsible for performing this credit evaluation. Laubach Aff.; Exs. K–1, L–1 and N.

20. Under the Business Loan Bond Insurance Pilot Program Procedural Guide, Ex. K–1, in cases where there is a private insurer, the private insurer is responsible for part of the credit review of the borrower. The general guide for credit analysis to be followed in this program is set forth in Robert Morris Associates, *Annual Statements Studies,* Philadelphia, Pennsylvania. There are five major areas covered by the credit review: (1) personal credit references; (2) site visit; (3) technical analysis of business's product or equipment to be purchased; (4) cash flow analysis; and (5) findings of public purpose.

21. The personal credit references of the owners, partners or major shareholders (if the business is closely-held) are to be evaluated when a personal guarantee or pledge of personal assets is a condition of the business development loan. Only if the personal credit reports are favorable will the business development loan be approved. Ex. K–1; Laubach Aff.

22. A staff member or representative of the Financial Management Division must personally visit the site where the business is located or where the borrower proposes to do business prior to adoption of the final resolution. To the extent feasible, the equipment the borrower proposes to acquire must also be examined. A report of the visit and examination becomes part of the business development loan file. Ex. K–1; Laubach Aff.

23. In those cases where the staff of the Financial Management Division is unfamiliar with the technology associated with the capital expenditure to be financed by the business development loan, the staff may require technical documentation from a reputable testing laboratory, engineering firm or other source of technical information. Such information shall be required only if it is necessary to verify the claims made by the borrower for the performance of a product manufactured by the borrower, or for a piece of equipment to be acquired by the borrower with the proceeds of a business loan. The staff may require documentation of the claims for the performance of products produced by the borrower in the form of reports from independent testing agencies (such as Underwriters' Laboratories) which are generally recognized to have expertise in the area. Ex. K–1; Laubach Aff.

24. To assure that the business development loan will be repaid, an analysis of the financial data in the file must be made. This includes documentation of the past performance of the company and projection of future performance. Ex. K–1; Laubach Aff.

25. The business development loan must also meet certain additional standards relating to public purpose. Ex. K–1. A business development loan is recommended for approval to the Authority only after it has been determined by staff of the Financial Management Division that the following standards of public purpose have been met:

A. The borrower is an "owner" and an "eligible small business" as defined in the Act;

B. The small business reasonably can be expected to maintain a sound financial condition and to retire the principal and pay the interest on the loan in accordance with the terms of the loan agreement;

C. The project is economically feasible with a reasonable expectation that

the life of its economic feasibility will exceed the maturity of the loan;

D. Except in the case of loans for pollution control facilities, the project will create or maintain a sufficient number and type of jobs to justify Authority participation in its financing, and the use of appropriated monies in the Economic Development Fund for insurance will enhance the creation or maintenance of jobs as a result of the loan;

E. The project feasibility is sufficient to allow the Authority to sell the bonds required for its financing;

F. The project and its development are economically advantageous to the state, the provision to meet increased demand upon public facilities as a result of the project is reasonably assured, and the energy sources to support the successful operation of the new project are adequate;

G. Except in the case of a loan for pollution control facilities, if the project has the effect of a transfer of jobs from one area of this state to another, there is sufficient evidence in the loan file to determine that the proejct is economically advantageous to the state or that the project is necessary to the continued operation of the business enterprise within the state;

H. The project will assist in fulfilling the purposes of the Act, including the preferences and priorities set forth in Minn.Stat. § 116J.89; and

I. If the project includes pollution control facilities, such facilities will help prevent, reduce, abate or control noise, air or water pollution or contamination in accordance with the provisions of the Act.

*The Energy Development Loan Pilot Program*

26. The Energy Development Loan Pilot Program of the Minnesota Energy and Economic Development Authority is created pursuant to Minn.Stat. §§ 116J.921 to 116J.923 and 116J.925 (Supp.1983). It is intended to provide "energy" loans to individuals, partnerships, corporations or other entities for the financing of capital improvements to be used in connection with a trade or business if the principal purpose of the improvement is energy conservation or the reduction of the use of conventional fuels as a source of energy. Exs. L, L–1 and M; Dayton Aff.

27. The program is intended to assist businesses located in Minnesota which require financing to improve the efficiency with which they use energy or to finance the costs of conversion from conventional to alternative sources of energy. Energy development loans may also be used to finance certain costs associated with the production of energy or fuels from alternative energy resources. Eligible business entities engaged in the production of peat, biomass, solar energy, wind, municipal wastes, agricultural or forestry wastes, hydropower and agricultural crops suitable for conversion to an energy fuel, as well as certain other alternative energy production enterprises, may also receive energy loans. Ex. L–1; Dayton Aff.

28. Funds for energy development loans will primarily be raised through the sale of revenue bonds issued by the Authority, the interest on which is generally exempt from federal income taxes. Loans are expected to carry interest rates below those generally available in the financial markets for loans with similar terms and security. These debt instruments will generally take the form of long term, fixed-rate loans for land, buildings, capital improvements or equipment. By pooling bonds and inducing the investment of private capital in connection with the energy development loans, the Authority's program facilitates a partnership between the private and public sectors. Ex. L–1; Dayton Aff.

29. Additional security for the bonds may be provided through segregated reserve accounts within the Energy Development Fund pledged to each loan made un-

der the Program. By providing such security for the bond issue, it will be possible to provide financial assistance to businesses which otherwise would be unable to receive financing due to risk factors associated with loans to such loan recipients. Ex. L–1; Dayton Aff.

30. Ultimate approval of an application for a loan under the Program depends, in part, upon a determination that the business entity applying for the energy development loan is creditworthy under generally accepted commercial lending credit evaluation practices, that the financial analysis of the performance of the business shows it is adequate to reasonably assure that the loan will be repaid and that the State of Minnesota will benefit through a reduction in the State's dependence on conventional fuels, through energy conservation, or through development of alternative or renewable. Ex. L–1; Dayton Aff.; Laubach Aff.

*The Energy Loan Insurance Pilot Program*

31. The same five major areas covered by the analysis under the Business Loan Bond Insurance Pilot Program are covered by the credit analysis under the Energy Development Loan Pilot Program. There are two areas where differences in the standards occur. First, all energy development projects must be reviewed for technical feasibility. Second, the public purpose standards vary slightly. Ex. L–1; Laubach Aff.

32. An energy development loan is recommended for approval when the following public purpose standards for the Energy Development Loan Pilot Program have been met:

A. The loan recipient is eligible to apply for the loan as provided in the Act, its rules and the Procedural Guide;

B. The loan recipient reasonably can be expected to maintain a sound financial condition and to retire the principal and pay the interest on the loan made and insured in accordance with the terms of the loan agreement;

C. The money saved or income produced by the capital improvements may reasonably be expected to exceed their total costs to the loan recipient within the greater of the term of the energy development loan or the economic useful life of the project;

D. The Authority may reasonably be expected to sell the bonds if any are required for financing;

E. The project and its development are economically advantageous to the State, that the provision to meet increased demand upon public facilities as a result of the project is reasonably assured, and that any feedstock availability, resource base or energy sources necessary to support the successful operation of the project is adequate;

F. The project will tend to foster a reliable supply of energy to Minnesota's households, business establishments or municipalities, tend to reduce Minnesota's dependence on imported energy sources, or serve some other energy related public purpose;

G. The project has a principal purpose of 1) energy conservation, 2) reduction of the usage of conventional fuels as a source of energy, or 3) development of Minnesota's alternative energy resources; and

H. The project satisfies the priorities and criteria of the Act.

Ex. L–1; 4 MCAR §§ 14.051–14.059.

33. The Energy Loan Insurance Pilot Program of the Minnesota Energy and Economic Development Authority is created pursuant to Minn.Stat. §§ 116J.921 through 116J.924. The program is intended to provide insurance for loans made by financial institutions for "qualified energy projects". These projects include acquiring, installing or constructing land, buildings, capital improvements or equipment for (1) conservation of energy or use of alternative or renewable energy resources in the operation of a business, (2) recovery or production from alternative or renewable energy resources of energy to be sold

in the course of business, or (3) production for sale in the course of business of equipment for the conservation or recovery of energy or for the use of energy from alternative or renewable resources. Exs. M, N; Dayton Aff.

34. By sharing the risk with private lenders, the State will facilitate investment of private capital in energy efficiency and will promote the creation of jobs, both directly and indirectly, by reducing energy consumption and by developing Minnesota's alternative energy resources. This partnership between the private and public sectors will enable emerging energy businesses to obtain capital and other financial resources necessary to fund their development. Ex. N; Dayton Aff.

35. The Energy Loan Insurance Pilot Program is currently structured to insure loans for "qualified energy projects" in an amount up to 90% of the principal amount of the loan. The Authority intends to use the monies in the energy loan insurance fund as an insurance pool which will insure a smaller percentage of loans for "qualified energy projects" than is the case under this pilot program. Once a pool of loans has been created, the energy loan insurance fund will operate in a manner similar to other insurance pools. Individual loans will be insured up to a contract amount, but the aggregate amount of the loans in the pool will be insured, in total, up to a lesser amount than the insurance for any given loan. Ex. N; Dayton Aff.

36. Because the pilot program is operating on a small scale basis, there are not a sufficient number of loans to leverage the risk of default with respect to any particular loan. Therefore, it is not feasible to operate the loan fund as a pool at this time. For this reason, the pilot program did not leverage funds within the energy loan insurance fund but rather dedicated a fixed amount of funds into an account set aside to insure a particular loan. Dayton Aff.

37. The same five areas of financial analysis required by the Business Loan Bond Insurance Pilot Program are required by the guidelines for the Energy Loan Insurance Pilot Program. In this program, the lender applying for insurance is required to perform the personal credit reference check and the cash flow analysis. Ex. N; 4 MCAR §§ 14.071–14.080.

38. The lender must also provide information related to the following requirements as part of the application for insurance. Upon receipt of appropriate information from the borrower, the lender must certify:

A. That the borrower is eligible to apply for the loan as provided in the Act, its rules and the Procedural Guide;

B. That the project is a Qualified Energy Project as defined in the Act;

C. That the borrower reasonably can be expected to maintain a sound financial condition and to retire the principal and pay the interest on the loan made and insured in accordance with the terms of the loan agreement;

D. That the money saved or income produced by the Qualified Energy Project may reasonably be expected to exceed its total costs to the borrower within the greater of the term of the energy loan insurance or the economic useful life of the Qualified Energy Project;

E. That the project satisfies the priorities and criteria of the Act.

Ex. N; 4 MCAR §§ 14.071–14.080.

39. Once the lender has provided the results of these checks to the Authority, the Financial Management Division performs the site visit and the technical analysis. Ex. N; Laubach Aff.

*Program Implementation*

40. As required by the procedural guides of all three pilot programs, a notice of program announcement was published. On November 17, 1983, a Notice of Program Announcement appeared in the Minneapolis Star and Tribune. Dayton Aff.; Ex. Q.

41. The required financial analysis was performed by the Financial Management

Division on each of the applications received by the Authority during the Pilot Program application period. Big Stone, Inc., (hereinafter "Big Stone"), Northland Glass Industries (hereinafter "Northland Glass"), and North Atlantic Technologies, Inc. (hereinafter "North Atlantic"), all received a favorable financial analysis and their applications were recommended for approval. Laubach Aff.

42. The Board of Directors of the Authority met on November 16, 1983, to establish these pilot programs. At that meeting the three pilot programs were discussed and resolutions adopting the procedural guides and setting funding limits for each program were passed. The resolutions adopted at the November 16 meeting pertaining to these programs were MEEDA Resolutions No. 83-51, 83-52, 83-53, 83-54, and 83-55. Dayton Aff.; Exs. K, L, M and O.

43. In MEEDA Resolution No. 83-52 the procedural guide and application for the Business Loan Bond Insurance Pilot Program were adopted. Ex. K.

44. MEEDA Resolution 83-52 authorized the Financial Management Division to accept applications for an amount not to exceed $3,000,000 in qualified financing. In addition, up to $900,000 was allocated from the Economic Development Fund ("Fund") to purchase private bond insurance or to fund a debt service reserve fund and for other eligible expenses. Any unexpended funds are required to be returned to the Fund after completion of the pilot program. Ex. K.

45. The application period for the Business Development Bond Insurance Pilot Program ran from November 17, 1983 through December 31, 1983. Ex. K.

46. In MEEDA Resolution No. 83-55, the procedural guide and application for the Energy Development Loan Pilot Program were adopted. Ex. L.

47. MEEDA Resolution 83-55 authorized the Financial Management Division to accept applications for an amount not to exceed $750,000 in qualified financing. In addition, up to $200,000 was allocated from the Economic Development Fund to fund a debt service reserve fund and other eligible expenses. Any unexpended funds are required to be returned to the Fund after completion of the pilot program. Ex. L.

48. The application period for the Energy Development Pilot Program ran from November 17, 1983 through December 31, 1983. Ex. L.

49. In MEEDA Resolution No. 83-55, temporary rules for the Energy Development Loan Pilot Program were adopted. These rules, which are contained in 4 MCAR §§ 14.051-14.059, outline the procedure the Authority must follow once a completed application is received for the Energy Development Loan Pilot Program. Exs. L, L-1.

50. In MEEDA Resolution No. 83-54, the procedural guide and applications for the Energy Loan Insurance Pilot Program were adopted. Ex. M.

51. Up to $800,000 from the Energy Loan Insurance Fund was allocated for the Energy Loan Insurance Pilot Program and other eligible expenses. Any unexpended funds are required to be returned to the Fund after completion of the pilot program. Ex. M.

52. The application period for the Energy Loan Insurance Pilot Program ran from November 17, 1983 through December 31, 1983. Ex. M.

53. In MEEDA Resolution No. 83-51 temporary rules for the Energy Loan Insurance Program were adopted. These rules, which are contained in 4 MCAR §§ 14.071-14.080, outline the procedure the Authority must follow once a completed application is received for the Energy Loan Insurance Pilot Program. Dayton Aff.; Ex. N.

54. On December 21, 1983, a meeting at the Board of Directors of the Authority was held. Dayton Aff.

55. At the December 21 meeting, MEEDA Resolution 83-60 was adopted. That resolution is the preliminary resolution for the Big Stone projects. In that resolution,

the Authority accepted Big Stone's application and gave the projects preliminary approval. Ex. A.

56. Also at the December 21, 1983 meeting, the Board adopted two resolutions amending the Energy Loan Insurance Procedural Guide and Agreements. MEEDA Resolution No. 83–62 amends the sections of the Procedural Guide pertaining to fees and rate of coverage. MEEDA Resolution 83–61 amends the Participating Lenders Agreement to clarify it and to facilitate participation by lenders. Dayton Aff.; Ex. O.

57. Also adopted on December 21, 1983, was MEEDA Resolution No. 83–63, granting preliminary approval to the North Atlantic project. Ex. G.

58. Another meeting of the Board of Directors of the Authority was held on December 29, 1983. At that meeting the preliminary resolution approving the Northland Glass project was adopted. The Northland Glass preliminary resolution is MEEDA Resolution No. 83–64. Ex. D; Dayton Aff.

59. At the December 28 Board meeting, two letters were received from David Printy, Secretary to the Board of Directors of the Authority, respectfully declining on advice of counsel to proceed as directed on the North Atlantic, Northland Glass and Big Stone resolutions. Ex. C; Ex. F; Dayton Aff.; Printy Aff.

60. MEEDA Resolution 63–65, authorizing commencement of legal action to determine the validity of the agreements to be entered into pursuant to Resolutions No. 83–60, 83–63 and 83–64, was adopted after Mr. Printy's refusal to act. Dayton Aff.; Ex. P.

*Big Stone Projects and Community Benefits*

61. On December 28, 1983, a Memorandum of understanding between the Authority and Big Stone detailing the respective obligations of the Authority and Big Stone in connection with loans to be made to Big Stone to be made by the Authority was executed by David C. Kraus, President of Big Stone, Inc. The loans are to be financed by the issuance by the Authority of revenue bonds, by the payment by the Authority of certain fees, and by the establishment by the Authority of reserve funds and bond insurance accounts with respect to the bonds. Ex. B; Kraus Aff.

62. Big Stone will contribute at least ten percent of the total capital costs of the projects in the form of an equity contribution of $68,400 to fund the projects. Ex. B; Kraus Aff.

63. Big Stone is ready, willing and able to proceed with the projects upon the terms and conditions set forth in the Memorandum of Understanding. Kraus Aff.

64. On December 20, 1983 Dougherty, Dawkins, Strand & Yost, Inc. (hereinafter "Dougherty") together with Van Kampen Meritt, Inc., entered into a commitment to underwrite the Big Stone bonds. Ex. R. Dougherty would not have entered into the commitment if the bonds were not to be insured. Peterson Aff. Dougherty continues to be ready, willing and able to fulfill this commitment. Peterson Aff.; Ex. R.

65. Van Kampen Merritt, Inc. continues to be ready, willing and able to fulfill this commitment. Van Kampen Merritt, Inc., would not have entered into the commitment to purchase the bonds if the bonds were not to be insured. Trim Aff.; Ex. R.

66. On December 6, 1983, Victor R. Haen, the treasurer of Big Stone, submitted an application to the Authority for financial assistance for a business development project, a pollution control project and an energy conservation project. Kraus Aff.

67. Each of the projects is within the corporate purposes authorized by the Articles of Incorporation of Big Stone. Mr. Haen was authorized to submit the application on behalf of Big Stone. Kraus Aff.

68. The business development project at Big Stone consists of installation of equipment to freeze vegetables in bulk for later processing into canned bean salads; canned peas and carrots; and canned mixed vegetables. The project will be located at Big

Stone's facility in Ortonville, Minnesota. Kraus Aff.

69. The ability to freeze vegetables for later canning will enable Big Stone to increase its efficiency by using its own raw vegetable stocks rather than purchasing frozen vegetables from other processors. The total estimated cost of the proposed project is $234,000. Kraus Aff.

70. Project costs include $64,000 for a 7 to 10 ton tunnel freezer, $25,000 for compressors and other equipment; $75,000 for building modifications for a "cold holding" room; $10,000 for totes (containers for frozen vegetables); and $60,000 for electrical, plumbing and equipment installation. Kraus Aff.

71. The project will provide 6 summer season jobs with an increase to the annual payroll of $27,300. The jobs created are new jobs and the project will not have the effect of transferring jobs from one area in Minnesota to another area in Minnesota. Kraus Supp.Aff.; Auger Aff.

72. The estimated useful life of the business development project is between 10 and 20 years. Kraus Aff.

73. No additional public facilities will be needed to support the business development project. Kraus Aff.

74. The pollution control project at Big Stone consists of the installation of a forcemain and irrigation system to provide wastewater treatment which will enable the company to meet state and federal water pollution laws and rules at its facility located in Arlington, Minnesota. Installation of the pollution control project is required as the result of a stipulation agreement entered into between Big Stone and the Minnesota Pollution Control Agency (hereinafter "PCA"), effective February 23, 1983. Kraus Aff.; Gardebring Aff.; Ex. U.

75. The PCA has determined that the existing pollution control facilities used by Big Stone do not provide acceptable waste treatment. The PCA has documented that overspray and runoff of waste water has occurred. Two fish kills have occurred in nearby surface waters because of the runoff from the spray field. Gardebring Aff.; Ex. U.

76. The PCA has previously granted Big Stone an extension of time for compliance with pollution control permits due to economic hardship to Big Stone if immediate compliance was required. Gardebring Aff.; Ex. U.

77. The PCA stipulation agreement requires Big Stone to construct the new spray field in three stages. If the system is not completed by 1985, the PCA is prepared to enforce the stipulation agreement. Gardebring Aff.; Ex. U.

78. Construction of the Big Stone pollution control project will improve water quality through the abatement of pollution. The improvement in water quality will improve the environment and help perserve public health.

79. The energy conservation project at Big Stone consists of the installation of equipment to use hot discharge water from the canning process for boiler infeed water. The total estimated cost of the proposed project is $30,000. Project costs include $20,500 for custom equipment; $1,500 for engineering and design; and $8,000 for installation. It is estimated that the project will save $15,075 per year in natural gas costs and $1,200 per year in water costs. Kraus Aff.; Dumagan Aff. After prorating these project costs, it will cost the Big Stone $.81 to avoid consuming each one million BTU of natural gas, which would cost $5.50 if it were consumed. Therefore, the net gain from the investment is $4.69 per one million BTU of natural gas conserved. Dumagan Aff.

80. The impact of the Big Stone project on the community of Ortonville will be as follows:

a. *Expansion of Local Tax Base.* While the assessed value of the City of Ortonville increased by approximately 27% between the years 1979 and 1983, local taxes collected increased less than 9% during the same period, according to data obtained from the Minnesota De-

partment of Revenue. The reason for this inconsistency is a decrease in the mill rate and an increase in state tax credits. The taxes collected in Ortonville have, in fact, decreased from $750,175 in 1979 to $704,163 in 1983. The proposed Big Stone business expansion project, a $165,000 capital improvement, will generate approximately $2,310 in new local property taxes to be shared by the city, county, and school district.

b. *Creation of New Jobs.* The proposed business development and expansion by Big Stone is expected to create six part-time positions in the City of Ortonville. The net impact is expected to benefit low and moderate income persons at entry level wage scales. The freezer will also help to turn what has, in the past, been a seasonal business cycle into a year round operation that will help to balance out demands on other phases of production. Each new part-time position will consist of 1,300 workhours per year.

c. *Benefit To Low and Moderate Income Persons.* A major state and federal objective of economic development assistance programs is to provide direct benefits to low and moderate income persons. Low and moderate income is defined as 80% of the median income for the area. The median family income for the City of Ortonville in 1979 was $17,064. Big Stone, Inc., proposes to hire six part-time employees (3.75 full-time equivalents) to operate the freezing equipment on a seasonal basis. Wages for these positions will be approximately $3.50 per hour, which is equivalent to $7,270 per year. Thus, these positions will tend to be filled by persons of low and moderate income. It is also anticipated that the positions created may provide sources of supplemental income for underemployed area residents.

d. *Secondary Impact of Project.* The secondary impact of the Big Stone Project will include temporary construction jobs ($60,000), and local spending within the Ortonville economy which will result from the increase in the payroll of Big Stone at its Ortonville plant. Auger Aff.

81. Conventional commercial financing for the business development, pollution control and energy conservation projects is unavailable on the terms set forth in the Memorandum of Understanding with the Authority. Kraus Aff. The availability of financing from the Authority is a substantial inducement for Big Stone to undertake the projects to be so financed. Kraus. Aff.

*Northland Glass Project and its Community Benefits*

82. On December 29, 1983, a Memorandum of Understanding between the Authority and Northland Glass detailing the respective obligations of the Authority and Northland Glass in connection with a loan to Northland Glass to be made by the Authority was executed by Randall L. Johnson, President of Northland Glass. The loan is to be financed by the issuance by the Authority of revenue bonds and the payment by the Authority of certain fees and the establishment by the Authority of reserve funds and bond insurance accounts with respect to the bonds. Ex. E; Johnson Aff.

83. Northland Glass will contribute ten percent of the total capital costs of the project in the form of an equity contribution of $75,000 to fund the project. Ex. E; Johnson Aff.

84. Northland Glass continues to be ready, willing and able to proceed with the business development project upon the terms and conditions set forth in the Memorandum of Understanding. Kraus Aff.

85. On December 23, 1983, Security State Bank of St. Michael (hereinafter "Security State Bank") continually committed to purchase the Northland Glass bonds. Ex. S. Security State Bank would not have entered into the commitment if the bonds were not to be insured. Security State Bank continues to be ready, willing and able to fulfill this commitment to buy the bonds when issued. Ederer Aff.; Ex. S.

86. On November 23, 1983, Randall L. Johnson, President of Northland Glass, submitted an application for financial assistance for a business development project to the Authority. The business development project is within the corporate purposes authorized by the Articles of Incorporation of Northland Glass. Johnson Aff.

87. The Northland Glass business development project consists of the acquisition and installation of a furnace capable of manufacturing horizontally tempered glass with a ⅛ inch tempering capacity. The glass tempering furnace will be installed at the Company's present facility located in Albertville, Minnesota. Johnson Aff.

88. The ability to produce tempered glass will permit Northland to supply needs for horizontal tempered glass in the six state region of Minnesota, Wisconsin, Iowa, North Dakota, South Dakota and Eastern Nebraska. The nearest competitive glass tempering furnace is located in Chicago. Tempered glass is three to five times stronger than regular (annealed) glass of the same thickness. Johnson Aff.

89. When subject to strains beyond its limits, tempered glass will disintegrate into innumerable blunt, cubical fragments, which helps protect people from serious injury. With tempered glass, any holes, cut-outs or edgework must be done prior to the tempering process. Tempered glass is a safety glazing material. Its use has increased since 1977, when federal regulations mandated the use of tempered glass in commercial and residential construction. Johnson Aff.

90. The total estimated cost of the proposed business development project at Northland Glass is $750,000. Project costs include $625,000 for a tempering furnace, $50,000 for hook-up costs, $35,000 for a glass washer, $30,000 for glass cutting support equipment and $10,000 for glass seamers. Johnson Aff.

91. The Northland Glass project will provide 20 jobs with an increase to the annual payroll. The jobs created are new jobs and the project will not have the effect of transferring jobs from one area of Minnesota to another area of Minnesota. Johnson Aff.; Auger Supp. Aff.

92. The estimated useful life of the Northland Glass project is between 15 and 20 years. Johnson Aff.

93. The primary impact of the Northland Glass business development project will be in new jobs created. The project will create a total of 20 new full-time jobs (13 male and 7 female). This represents an average cost of $37,500 per job, which compares favorably with the $100,000 per job cost for a Fortune 500 firm. The increase in annual payroll resulting from the 20 new positions will be approximately $405,600 per year. The increase in the payroll will stimulate up to approximately $608,400 in spending within the Albertville economy, because of the multiplier effect of the increase in the payroll. Auger Supp. Aff.

94. Conventional financing is not available on the terms set forth in the Memorandum of Understanding between the Authority and Northland Glass. Johnson Aff. The availability of financing from the Authority is a substantial inducement for Northland Glass to undertake the business development project. Johnson Aff.

*North Atlantic Project and its Community Benefits*

95. On December 21, 1983, the Minnesota Energy and Economic Development Authority Energy Loan Insurance Pilot Program Participating Lenders Agreement was executed on behalf of Norwest Bank Minneapolis, N.A., (hereinafter "Norwest Bank") by Thomas Linhares, Vice President. Ex. H; Linhares Aff.

96. North Atlantic continues to be ready, willing and able to proceed with the energy loan on the terms and conditions set forth by the lender, Norwest Bank. North Atlantic is also ready, willing and able to enter the Energy Loan Agreement with Norwest Bank and the Authority for insuring the loan. Appert Aff.

97. On November 30, 1983, John J. Appert, treasurer and secretary of North At-

lantic submitted an application to Norwest Bank for an energy loan under the Authority's pilot program. Appert Aff.; Linhares Aff.

98. Norwest Bank continues to be ready, willing and able to make the loan to North Atlantic on the terms and conditions set forth in its letter to North Atlantic granting a conditional line of credit. Linhares Aff.; Ex. T.

99. On December 2, 1983, John J. Appert submitted an Energy Loan Insurance Pilot Program Borrowers Application to the Authority on behalf of North Atlantic. Appert Aff.

100. On December 20, 1983, John J. Appert accepted, on behalf of North Atlantic, a conditional loan commitment from Norwest Bank and agreed to all the terms and conditions therein. As treasurer and secretary of North Atlantic, Mr. Appert is authorized to file such applications and accept loan commitments as well as to obligate North Atlantic to the terms and conditions of such loans. Appert Aff.; Linhares Aff.

101. The projects to be financed through the pilot program loan to North Atlantic are the design, manufacture and installation of open channel air preheater systems (hereinafter "OCAP") at various industrial sites, primarily in Minnesota and the surrounding states. North Atlantic expects to finance 5 or 6 projects with the proceeds of the loan. Such projects are within the corporate purposes of North Atlantic. Appert Aff.

102. North Atlantic contracts with Sterner Industries in Winsted, Minnesota, and Lindorfer Engineering Co., in Roseville, Minnesota, for heat exchanger fabrication and assembly, and with Wolkerstarfer Company, Inc., in New Brighten, Minnesota, for surface coating of heat exchanger plates. Appert Aff.

103. An example of the type of project that North Atlantic will finance with this loan is the OCAP recently installed by North Atlantic at Anderson Customer Processing, Inc., Little Falls, Minnesota. That project involved the design, fabrication, and installation of a heat exchanger to recover sensible and latent heat from a milk drier exhaust system. The recovered heat is transferred to the fresh air entering the drier. The design work on this project began August 2, 1983 and the OCAP will be put into operation February 6, 1984. The heat exchanger will recover 1.44 million BTU/hr. at the design conditions. The OCAP has a useful life of 20 years. Appert Aff.

104. Each OCAP is expensive, costing approximately $80,000. Appert Aff. In the case of the typical energy conservation project proposed to be installed by North Atlantic, the average cost of avoiding consumption ranges from $.28 to $.63 per million cubic feet of natural gas. The average commercial price of natural gas ranges from $4.87 to $5.22. Since the savings in million cubic feet of natural gas per year can range from 8,000 to 30,000 million cubic feet, the installation of such energy conservation equipment will result in substantial savings of natural gas and reduce dependence upon imported fuel. It will also beneficially effect the economy because savings from energy conservation will be available for alternative investments.

105. Conventional financing on the terms available through the Authority insurance program is not available to North Atlantic. Appert Aff.; Linhares Aff.

*Need for and Benefits from Business Development Financing Programs*

106. The ability of small businesses to secure adequate financing is often limited. Interest costs may be prohibitively high, banks may be loaned to their lending limits, or the geographic location of major lenders may not be accessible to the potential borrower. Dayton Aff.; Laubach Aff.; Auger Aff.; Constance Aff.; Peterson Aff.; Trim Aff.

107. The primary sources of financing business development projects in Minnesota are commercial banks, savings and loan associations, insurance companies, venture capital companies, and public sources, such as municipal industrial revenue bonds, and

state or federal loan and grant programs. Dayton Aff.; Auger Aff.

108. The use of industrial revenue bonds in Minnesota has increased dramatically in recent years. However, it is impractical to finance small business loans for less than $100,000 with industrial revenue bonds because of high legal and underwriting costs. Also, pending federal legislation threatens the tax exempt status of industrial revenue bonds and may restrict the amount of industrial revenue bonds that can be issued in each state. Dayton Aff.

109. Because of the importance of small and medium sized businesses in job creation and the difficulties these business have in obtaining financing, there is need and support for the expenditure of state funds to assist the establishment or expansion of small and medium-sized businesses in Minnesota. Dayton Aff.; Laubach Aff.; Auger Aff.; Constance Aff.

110. Public financing is of great importance in that it leverages private financing. Private lenders generally provide only part of the financing for a project, and the borrower is expected to provide the balance. For small businesses, it is often difficult to make up the balance, and good business development projects may never be undertaken for lack of financing. Public financial assistance helps bridge the gap between what the private lender will loan and what the small business needs to finance a project. Dayton Aff.; Auger Aff.; Constance Aff.

111. Providing public financing for business development at less than market interest rates creates incentives for additional private investment and enables a business to have more capital available for operating purposes. Lower downpayments and lower interest costs made available through public financing enable a business owner to conserve working capital while, at the same time, increasing the rate of return on investment. The result is an economically more stable business. Dayton Aff.; Constance Aff.

112. Providing public service to commercial and industrial areas in a community is expensive from the standpoint of local government. Public safety, fire protection, public works, and utilities are more costly in commercial/industrial areas than residential areas. Public and private investments in commercial areas result in increased taxable property values, which helps balance out the high costs of providing public service and ensure that local tax receipts are sufficient to pay local government costs. The beneficiaries of an increased local tax base are the general public. Dayton Aff.; Constance Aff.; Peterson Aff.; Trim Aff.

113. Public financial assistance also helps small businesses invest in new plants and equipment which they could not otherwise afford. When a business invests in new plants or equipment, new permanent jobs are normally created. Residential construction normally results only in temporary construction jobs, while commercial and industrial construction results in both construction jobs and long-term manufacturing and business jobs. New equipment or plant expansion normally improves productivity, which means new inventory handlers, sales staff, shippers, and administrators will be hired. Dayton Aff.; Auger Aff.; Constance Aff.

114. Public financing of business development helps create jobs. New and expanding businesses normally establish entry level jobs which can be filled by persons with minimal training or employment experience. Because these people are the ones hardest hit by unemployment, financing small business expansion has tremendous public benefit. Dayton Aff.; Auger Aff.

115. In addition to the direct benefits derived from public financing of small business expansion—increased tax base and employment—there are favorable secondary economic effects. Jobs are created in businesses not directly financed because of the increased demand for goods and services by the new employees of the financed business. Additionally, business development around the financed business may

increase to provide raw materials for that business or an outlet for its finished products. Dayton Aff.; Auger Aff.; Constance Aff.

116. The major advantage of the Authority over its predecessor, the Small Business Finance Agency, is that it is a "one stop shop" for all financing programs offered small businesses by the state. The owner or manager of a small business only has to talk to one person to find out what program of financial assistance will best meet the needs of his business. The Authority's employees are cross-trained on all programs to provide the easiest, most efficient service. No longer is it necessary for a small business owner to travel between a variety of state offices to explore possible sources of financial assistance for business expansion. Laubach Aff.

117. On the average, for each $55,500 loaned to a small business by the Small Business Finance Agency (the predecessor agency of the Authority) for a business development project, one full-time job was created. Money loaned to businesses for expansion by federal, state or local government does serve to create jobs. Laubach Aff.

118. In Minnesota, municipalities that intend to issue revenue bonds must have those bond issues approved by the Commissioner of Energy, Planning and Development pursuant to Minn.Stat. § 474.01 (1982). The application must include the proposed amount of the bond issue and the approximate number of jobs to be created. Based on applications for bonding approved from 1970 through 1983, there was to be an average expenditure of $46,600 for each full-time job created. If pollution control issues are eliminated from the calculations, the per job cost in 1981 was $40,200; in 1982 was $36,400; and in 1983 was $36,700. After July 1, 1983, the approval of bond issues pursuant to Minn.Stat. § 474.01 was transferred to the Authority by Minn.Laws 1983, ch. 289, § 113. Laubach Aff.

119. Sale of revenue bonds to finance business expansion creates jobs at a reasonable cost. This type of financing is necessary to fill a gap left by the commercial loan policies of conventional lenders which favor larger established companies. Frequently, the minimum loan requirements of commercial banks prevent financing projects for small businesses. There is a need on the part of small businesses for financial support from government if they are to create jobs. Laubach Aff.; Peterson Aff.; Trim Aff.

*Need for and Benefits from Pollution Control Financing Programs.*

120. Under Minn.Stat. ch. 116, the MPCA was created to meet the various and complex water, air and land pollution problems in affected areas of the State. MPCA's statutory objective is to achieve a reasonable degree of purity of water, air and land resources of the state consistent with the maximum enjoyment and use thereof in furtherance of the welfare of the people of the state. Gardebring Aff.

121. MPCA is responsible for administering and enforcing statutes and rules relating to pollution of any water, air and land in the State of Minnesota. Gardebring Aff.

122. The State is trustee of the waters of the State. The legislature has declared that it is the policy of the state to provide for the prevention, control, and abatement of pollution of all waters of the State, so far as feasible and practical, in furtherance of conservation of such waters and protection of the public health and in furtherance of the development of the economic welfare of the state. Gardebring Aff.

123. Abatement of pollution of the water, air, and land is a primary concern of our citizenry. Preservation of public health and welfare through abatement of pollution is an essential governmental function. Gardebring Aff.

124. Small businesses experience difficulty in obtaining financing for necessary pollution control projects. Kraus Aff.

125. Public financial assistance to small businesses for the costs of pollution control equipment can bring the costs of such equipment to a manageable level for small

businesses. Such financial assistance will increase the installation of pollution control facilities and, thus improve the environment and public health.

126. Pollution control financial assistance to small businesses will retain jobs which might otherwise be lost if small businesses were forced to close because of their inability to obtain financing for required pollution control projects.

*Need for and Benefits from Energy Conservation and Alternative Energy Development Programs.*

127. Energy used in Minnesota is almost wholly an imported commodity. By reducing the outflow of energy expenditures from the state, investments in energy conservation will tend to increase the total amount of financial resources for all types of investments within the state, provided that the investments in energy conservation are cost-effective or competitive vis-a-vis other investments, such as those for business expansion. Dumagan Aff.

128. Energy conservation investments have been viewed by conventional financing sources in a manner different from investments for business expansion. It is reasonable for the Legislature to determine that the asymmetrical treatment between these two types of investments needs to be corrected, since the impacts of these two investments on business profitability are in parallel directions. Whereas, investments for business expansion tend to increase the revenue side, investments in energy conservation tend to decrease the cost side. Dumagan Aff.

129. If an investment in energy conservation has an internal rate of return higher than the market rate of interest, then the investment cost per unit of conserved energy is less than the price paid for the same unit of energy if it were instead consumed. In this connection, energy conservation is, in principle, the same as energy production, in that energy conservation increases the supply of energy to uses other than the point of use where conservation occurred.

When viewed in this light, cost effective energy conservation in Minnesota is the same as producing energy at a cost per unit cheaper than the price per unit of imported energy. Dumagan Aff.

130. It is reasonable for the Legislature to determine that it makes economic sense to invest in energy conservation in Minnesota. The opportunities to achieve net gains from energy conservation have not as yet been exhausted. Dumagan Affidavit.

131. Very little conventional financing is available for energy conservation companies because most such companies are new and have unknown and unproven technologies. Linhares Aff.; Appert Aff.; Kraus Aff.

132. Financial assistance programs such as the Authority's energy loan and energy loan insurance program are necessary if energy conservation businesses are to be financed. Linhares Aff.

## CONCLUSIONS OF LAW

1. The issuance of bonds, the making of loans, the insurance of bonds, the payment of certain fees in connection with said bonds, and the insurance of loans, in connection with the business development, pollution control and energy conservation programs of the plaintiff, as provided by the Act, constitute expenditures of public funds for public purposes and do not violate Minn. Const. art. X, § 1.

2. The issuance of bonds, the making of loans, the insurance of bonds and the payment of certain fees in connection with said bonds, in connection with the business development, pollution control and energy conservation projects of Big Stone as provided by the Act, constitute expenditures of public funds for public purposes and do not violate Minn. Const. art. X, § 1.

3. The issuance of bonds, the making of loans, the insurance of bonds and the payment of certain fees in connection with said bonds, in connection with the business de-

velopment project of Northland Glass as provided by the Act, constitute expenditures of public funds for public purposes and do not violate Minn. Const. art. X, § 1.

4. The insurance of loans in connection with the energy conservation project of North Atlantic as provided by the Act, constitutes an expenditure of public funds for a public purpose and does not violate Minn. Const. art. X, § 1.

5. The issuance of bonds, the making of loans, the payment of certain fees in connection with said bonds, and the insurance of loans, in connection with the business development, pollution control and energy projects of Big Stone, Northland Glass and North Atlantic as provided by the Act, will not make the State a party in carrying on works of internal improvement contrary to the Minn. Const. art. XI, § 3.

6. The bonds, bond insurance and loan insurance which plaintiff is empowered by the Act to issue do not constitute a public debt within the meaning of Minn. Const. art. XI, § 4.

7. The issuance of bonds, the making of loans, the insurance of bonds, the payment of certain fees in connection with said bonds, and the insurance of loans, in connection with the business development, pollution control and energy projects of Big Stone, Northland Glass and North Atlantic do not result in the credit of the State being given or loaned in aid of any individual, association or corporation within the meaning of Minn. Const. art. XI, § 2.

8. The Act does not unconstitutionally delegate the power of the Legislature to the plaintiff, an agency of the State, within the meaning of Minn. Const. art. III, § 1.

9. The Act does not unconstitutionally delegate the power of the Legislature either to the United States Congress or to any agency of the Government of the United States within the meaning of Minn. Const. art. III, § 1.

10. Defendant is authorized, empowered and obligated to execute the documents and to perform all other necessary acts in connection with the sale and issuance of bonds, the making of loans, the insurance of bonds, the payment of certain fees in connection with said bonds, and the insurance of loans, in connection with the business development, pollution control and energy conservation projects of Big Stone, Northland Glass and North Atlantic.

11. Plaintiff is entitled to Summary Judgment granting to it all relief requested in its Complaint.

## ORDER FOR JUDGMENT

IT IS HEREBY ORDERED that plaintiff be and hereby is awarded judgment declaring the issuance of bonds, the making of loans and the insurance of loans or bonds by plaintiff in connection with the business development, pollution control and energy conservation projects of Big Stone, Northland Glass and North Atlantic, as provided by the Act, are constitutional and valid in all respects.

IT IS FURTHER ORDERED that defendant be and hereby is directed to carry out his statutory responsibilities and duties with respect to the execution of documents and performance of all other necessary acts in connection with the issuance of these bonds, the making of these loans, the insurance of these bonds, the payment of certain fees in connection with said bonds, and the insurance of these loans.

LET JUDGMENT BE ENTERED ACCORDINGLY.

The attached Memorandum is made a part hereof.

## MEMORANDUM

■ This declaratory judgment action is brought by plaintiff, Minnesota Energy and Economic Development Authority, against David L. Printy, as Secretary of plaintiff, to obtain a declaration of the constitutional validity of the Minnesota Energy and Economic Development Act, Minn.

Stat. §§ 116J.875–116J.926 (1982 & Supp. 1983) (hereinafter "the Act"). The Act has essentially three purposes: (1) business development; (2) pollution control; and (3) energy financing. The constitutionality of the Act was challenged by defendant by his refusal to approve applications for funding under the respective statutory programs. His refusal is based on four grounds:[1] (1) that the Act provides for expenditures of public funds for private purposes; (2) that the Act makes the State a party in carrying on works of internal improvement; (3) that the Act provides for the contracting of public debt and pledges the credit of the state in aid of private corporations and (4) that the Act impermissibly delegates the power of the legislature. For the reasons discussed below, the Court finds the Act constitutional and valid in all respects, both on its face and as applied to projects challenged in this action.

### 1. *Determination of Public Purpose.*

■ It is axiomatic that public funds may only be used for public purposes. Article X, § 1 of the Minnesota Constitution expressly provides: "taxes shall be ... levied and collected for public purposes." This principle is also implicit in the language of article XI, § 2 and article XII, § 1 which provide:

The credit of the state shall not be given or loaned in aid of any individual, association or corporation....

Minn. Const. art. XI, § 2.

The Legislature shall pass no local or special law ... authorizing public taxation for a private purpose.

Minn. Const. art. XII, § 1.

Numerous Minnesota cases have set forth the parameters for determining whether an expenditure of public funds is for a public purpose. It has long been recognized that the meaning of public purpose is not static, but instead is ever evolving in light of contemporary conditions.[2] Perhaps the most complete and often cited statement of the factors to be considered in determining whether a valid public purpose is present is found in *Visina v. Freeman:*

What is a "public purpose" that will justify the expenditure of public money is not capable of a precise definition, but the courts generally construe it to mean such an activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government.

*Visina v. Freeman,* 252 Minn. 177, 184, 89 N.W.2d 635, 643 (1958).

■ Recent decisions have established that while legislative determinations of public purpose are not binding upon the courts, they are entitled to great weight.

---

**1.** It is important to note at the outset that defendant's burden in challenging the constitutionality of the Act is a heavy one. It is well settled "that acts of the legislature are presumed to be constitutional and will not be declared unconstitutional unless their invalidity appears clearly or unless it is shown beyond a reasonable doubt that they violate some constitutional provisions. Statutes are to be construed so as to uphold their constitutionality." *Higher Education Facilities Authority v. Hawk,* 305 Minn. 97, 103, 232 N.W.2d 106, 110 (1975) (citations omitted). As the United States Supreme Court has noted, when a state legislature speaks, the public interest has been declared in terms which are "well-nigh conclusive." *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954).

**2.** See, e.g., *Lifteau v. Metropolitan Sports Facilities Commission,* 270 N.W.2d 749, 754–55 (Minn. 1978) (construction of sports facility for use by professional sports teams is a public purpose); *R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331, 337–38 (Minn.1978) (construction of parking facility to be leased to private developer and to induce other private development is a public purpose); *Minnesota Housing Finance Agency v. Hatfield,* 297 Minn. 155, 210 N.W.2d 298 (1973) (construction of low and moderate income housing by nonpublic agencies is a valid public purpose); *Minnesota Pollution Control Agency v. Hatfield,* 294 Minn. 260, 200 N.W.2d 572 (1973) (construction of municipal pollution control projects is a public purpose); *City of Pipestone v. Madsen,* 287 Minn. 357, 178 N.W.2d 594 (1970) (construction of industrial facilities to be leased on a long term lease to a private corporation is a public purpose); *Visina v. Freeman,* 252 Minn. 177, 89 N.W.2d 635 (1958) (construction of port facilities is a public purpose); *Central Lumber Co. v. City of Waseca,* 152 Minn. 201, 188 N.W. 275 (1922) (operation of a lumber and coal yard is a public purpose).

*Lifteau v. Metropolitan Sports Facilities Commission,* 270 N.W.2d at 754–55; *Minnesota Housing Finance Agency v. Hatfield,* 297 Minn. at 167, 210 N.W.2d at 305–06; *City of Pipestone v. Madsen,* 287 Minn. at 364–65, 178 N.W.2d at 599–600; *Housing and Redevelopment Authority of St. Paul v. Greenman,* 255 Minn. 396, 403–04, 96 N.W.2d 673, 679 (1959). As the Supreme Court has stated, "This presumption necessarily makes the scope of review of such governmental decisionmaking extremely narrow, and a reviewing court should overrule a legislative determination that a particular expenditure is made for a public purpose only if that determination is manifestly arbitrary and capricious." *R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d at 337. The Minnesota Supreme Court has held that "extraneous factors such as the mode of financing have no bearing on the issue of public purpose." *Lifteau v. Metropolitan Sports Facilities Commission,* 270 N.W.2d at 754 n. 6; *R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d at 339 n. 6. The proper focus of inquiry for this Court is whether the expenditures will benefit the community as a whole and are related to the functions of government, *Visina v. Freeman,* 252 Minn. 184–85, 89 N.W.2d at 643.

2. *The Expenditure Of Public Funds For Acquisition Of New, Or Improvement Of Existing, Personal Or Real Property Constitutes An Expenditure For A Public Purpose.*

 A significant purpose of the Act is to promote the welfare and prosperity of the State by maintaining and increasing the career and job opportunities of its citizens and protecting and enhancing the tax base on which state and local governments depend upon for the financing of local governments. Minn.Stat. § 116J.88, subd. 7 (Supp.1983). As discussed above, a legislative determination of public purpose, will only be overruled if it is manifestly arbitrary or unreasonable. *R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d at 337. Defendant has failed to meet his burden of establishing that the legislative determination that the expenditures of public funds for the business development projects in question should be overruled.

It is clear that the community as a whole will benefit from the expenditures of public funds in connection with the business development projects of Big Stone and Northland Glass, both of which are small businesses. This is amply demonstrated by a review of the anticipated benefits of these projects which are documented in the affidavits submitted by plaintiff. The business development program projects for Big Stone and Northland Glass will fulfill the stated legislative purpose of job creation and improving the local tax base. Defendant has not disputed this evidence.

The specific community benefits from the Big Stone and Northland Glass business development projects, as set forth in the Findings of Fact, demonstrate that the community at large will benefit. Creation of new jobs is of vital importance to the State of Minnesota, particularly in times of recession. The Minnesota Supreme Court has long recognized the expenditure of public funds to provide jobs is a public purpose. In *Moses v. Olson,* 192 Minn. 173, 255 N.W. 617 (1934), the Court upheld a depression-era work relief program as unquestionably serving a public purpose. In *Chun King Sales, Inc. v. County of St. Louis,* 256 Minn. 375, 98 N.W.2d 194 (1959), the Court found the purchase by the State of a building and equipment to lease to a private company served the public purpose of alleviating unemployment in St. Louis County. In addition to the business development and job creation programs at issue in this case, the 1983 Minnesota Legislature also passed other legislation aimed at providing jobs for Minnesotans, including the Minnesota Emergency Employment Act, Minn.Laws 1983, ch. 312, art. 7, and the Minnesota Job Skills Partnership Act, Minn.Stat. ch. 116L (Supp.1983).

As set forth in the Findings of Fact, business development projects result in the creation of new jobs. During the period from 1969 through 1976, small businesses generated 86.7% of all new private sector

jobs. During the same time period, the nation's largest 1,000 corporations contributed only ½ of one percent of the new jobs created. Several studies have demonstrated the important role of small businesses in creating jobs and stimulating economic growth. The number of jobs created by business development projects is further demonstrated by the experience of plaintiff's predecessor agency, the Small Business Finance Agency, in creating jobs by financing business development projects through the issuance standard conduit-type of revenue bonds. That the issuance of revenue bonds to finance business expansion creates jobs at a reasonable cost is also demonstrated by the experience of municipalities in Minnesota which have financed business development projects through the issuance of revenue bonds. It is, thus, amply demonstrated that providing financing to small businesses creates jobs. It is also undisputed that small businesses, for the very reason that they are small, experience difficulty in obtaining financing.

The benefits from the Big Stone and Northland Glass projects are very much like the community benefits which resulted from the municipal industrial development financing project approved by the Minnesota Supreme Court in *City of Pipestone v. Madsen.* As the Court stated in that case:

> Providing gainful employment for our people will increase their purchasing power, improve their living conditions, and relieve the demand for unemployment and welfare assistance. New or modernized buildings will add properties to the tax lists and increase the tax base. There is little doubt that the establishment of new and improved industry will measurably increase the resources of the community, promote the economy of the state, and thereby contribute to the welfare of its people. These benefits are clearly public in nature.

287 Minn. at 372, 178 N.W.2d at 603. Just as the benefits in *Pipestone* were "clearly public in nature," so too are the benefits which will result from the business development financing challenged in the instant case.

While it is undisputed that both Big Stone and Northland Glass will receive a large benefit from this program, that fact alone does not invalidate the program. *Visina v. Freeman,* 252 Minn. at 184–85, 89 N.W.2d at 649. In *Pipestone,* the court upheld the Municipal Industrial Revenue Bond Act against a challenge that the particular private corporation which was to be the beneficiary of the revenue bonds would receive a large benefit. In so holding, the Court applied the following analysis:

> Since the legislative enactment and the proposed project pursuant thereto are reasonably designed to combat a problem within the competence of the legislature, and since the public will benefit from the project, the project is sufficiently public in nature to withstand constitutional challenge.

*Id.* at 287 Minn. 373, 178 N.W.2d at 603–04.

■ It is well settled that economic development financing is a proper function of government. In *Pipestone,* the Court noted that, as of the date of its opinion, the highest appellate courts of 22 jurisdictions had upheld the validity of legislation authorizing government industrial development bonds or other types of financial assistance; thirteen states had provided for such financing by constitutional provisions; and only four states had determined that economic development financing did not serve a governmental function. It is well established that Minnesota and the great majority of other jurisdictions hold that government financing for economic development serves a public purpose.

Defendant seeks to distinguish this case from prior Minnesota cases which have recognized that economic development financing serves a public purpose on the ground that the type of financial assistance is different. As previously noted, the Minnesota Supreme Court has stated that the mode of financing is not relevant to a determination of whether a public purpose exists. *Lifteau v. Metropolitan Sports Facilities Commission,* 270 N.W.2d at 754, n. 6; *R.E.*

*Short Co. v. City of Minneapolis,* 269 N.W.2d at 339, n. 6.

■ The majority of Minnesota cases approving business development financing have involved conduit revenue financing where the state or municipal authority issues the bonds, purchases the property and enters into an extended lease with the private corporation.[3] In conduit financing, the revenue bonds are to be repaid solely out of the proceeds from the leases. *See generally Minnesota Housing Finance Agency · v. Hatfield,* 297 Minn. 155, 210 N.W.2d 298; *Higher Education Facilities Authority v. Hawk,* 305 Minn. 97, 232 N.W.2d 106; *City of Pipestone v. Madsen,* 287 Minn. 357, 178 N.W.2d 594; *Port Authority of City of St. Paul and Others v. Fisher (Port Authority I),* 269 Minn. 276, 132 N.W.2d 183; *Port Authority of City of St. Paul and Others v. Fisher (Port Authority II),* 275 Minn. 157, 145 N.W.2d 560. Financing through general obligation bonds or tax appropriations has usually been limited to circumstances where the state or municipality will develop a government owned and operated facility.[4] However, the Court upheld the constitutionality of expenditures of appropriated funds for loans to nonprofit corporations as seed money for the development of new low income housing in *Minnesota Housing Finance Agency v. Hatfield,* 305 Minn. 155, 210 N.W.2d 298. The Court has also implicitly permitted the direct expenditure of appropriated funds by the payment of costs of condemnation. *E.g., City of Minneapolis v. Wurtele,* 291 N.W.2d 386 (Minn.1980); *Housing and Redevelopment Authority of Minneapolis v. Froney,* 305 Minn. 450, 234 N.W.2d 894 (1975); *Housing and Redevelopment Authority v. Greenman,* 255 Minn. 396, 96 N.W.2d 673 (1959). The ex-

penditure of public funds permitted through the redevelopment statutes is analogous to the expenditures of appropriated funds for costs of issuance and insurance reserve accounts which are permitted by the Act in question.

■ For the reasons discussed above, the expenditures questioned in the instant case for business development projects are constitutionally permissible expenditures for a public purpose.

3. *The Expenditure Of Public Funds For Acquisition Of Pollution Control Equipment At Existing Facilities Of Private Businesses Constitutes An Expenditure For A Public Purpose.*

The Act specifically declares that it was "enacted to promote the welfare and prosperity of the state ... by reducing, controlling, and preventing environmental pollution...." Minn.Stat. § 116J.89, subd. 2 (Supp.1983). By providing such financial assistance, the cost to small businesses of pollution control equipment and disposal of waste will be reduced to a "manageable level." Minn.Stat. § 116J.89, subd. 1 (1982).

The Big Stone pollution control project consists of the installation of a forcemain and irrigation system to provide waste water treatment which will enable the company to meet state and federal water pollution laws and rules at its facility located in Arlington, Minnesota. The public has an interest in the prevention of pollution of air and water and land in the State and, further, that the police powers of the State extend to the control of pollution and disposal of waste in the State. The Minnesota Supreme Court has explicitly approved the expenditure of public funds for the con-

---

3. To focus upon whether the particular facility being financed is constructed with public funds and then leased to a private corporation or whether the private company is directly loaned the funds to construct the facility, is a distinction without a difference. Most of the long-term leases in question grant the lessee many of the commonly understood incidents of outright ownership. In many instances the leases are

for the projected useful life of the improvements so constructed.

4. *See R.E. Short Company v. City of Minneapolis,* 269 N.W.2d 331; *Lifteau v. Metropolitan Sports Facilities Commission,* 270 N.W.2d 749; *Minnesota Pollution Control Agency v. Hatfield,* 294 Minn. 260, 200 N.W.2d 572; *Visina v. Freeman,* 252 Minn. 177, 89 N.W.2d 635.

struction of public facilities for the control of pollution. *Minnesota Pollution Control Agency v. Hatfield*, 294 Minn. 260, 200 N.W.2d 572 (1973). In that case, the Court approved the issuance of state bonds for pollution control loans and grants to political subdivisions for the construction of pollution control facilities. In upholding the state bonds, the Court held:

> Pollution of our air and waters has now become one of the chief concerns of our citizenry. It must be generally conceded that alleviation of pollution in our waters in order that they may be made safe for human consumption and safe for recreational purpose and the propagation of fish involves the preservation of the public health as well as the public welfare and as such it constitutes a governmental function. . . .

*Id.* 294 Minn. at 265, 200 N.W.2d at 575. The *PCA* case is persuasive evidence of the fact that a public purpose is served by pollution control expenditures.

Pursuant to the test formulated in *Visina v. Freeman*, 252 Minn. 177, 89 N.W.2d 635 (1958), discussed above, an activity has a public purpose if it is one which "will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government." *Id.* at 184, 89 N.W.2d at 643. Thus, it first must be established that a public benefit will inure from the proposed activity. In this case the public benefit is clear. The construction of the pollution control project at Big Stone is designed to eliminate runoff of waste water which has resulted in pollution to public waters of the State. The benefit to the public from abatement of pollution is clear, whether the abatement of pollution results from the construction of private or publicly owned pollution control facilities.[5]

It is well settled that legislative determinations of public purpose should be overruled only if it can be established that the particular expenditure is manifestly arbitrary or capricious. *E.g., R.E. Short Co. v. City of Minneapolis*, 269 N.W.2d 331, 340 (1978). Defendant's naked assertion that the benefit to the public is only incidental in comparison to the benefit to Big Stone does not satisfy the heavy burden which the defendant must bear in establishing that the challenged expenditure is not for a public purpose. Defendant's burden is particularly heavy since it is well settled that a private corporation's receipt of a large benefit from public financial assistance does not in and of itself invalidate the project. *City of Pipestone v. Madsen*, 287 Minn. 357, 178 N.W.2d 594 (1970). The combatting of pollution is clearly a subject matter which is within the competence of the Legislature. The benefits from the installation of pollution control facilities to the public through the protection of the air, land and waters of the State is clear. While some private benefit will result, the project is sufficiently public in nature to withstand constitutional challenge.

The second factor set forth by the court in *Visina v. Freeman*, 252 Minn. at 184–85, 89 N.W.2d at 643, which must be satisfied before a public purpose can be established is that the project financed is one that is directly related to the function of government. Again, the abatement of pollution is a legitimate function of government. *Minnesota Pollution Control Agency v. Hatfield*, 294 Minn. at 265, 200 N.W.2d at 575; Gardebring Aff.

The great weight of authority from other jurisdictions has upheld the constitutionality of providing public financial assistance for pollution control facilities to private companies through revenue bond financing. *E.g., Advisory Opinion Regarding Consti-*

---

**5.** The Court does not find the *Stanley v. Department of Conservation and Development*, 284 N.C. 15, 199 S.E.2d 641 (N.C.1973), to be persuasive. *Constitutional Law—Public Purpose—Restricting Revenue Bond Financing of Private Enterprise*, 52 N.C.L.Rev. 859 (1974). The court in *Stanley* held that the public interest could be served by the assertion of the police powers to abate pollution and that it would be preferable to achieve the result through the exercise of the state police power without the expenditure of public funds. Moreover, *Stanley* can be factually distinguished.

*tutionality of PA 1975 No. 301,* 400 Mich. 270, 254 N.W.2d 528 (1977); *Opinion of the Justices,* 113 N.H. 201, 304 A.2d 89 (1973); *State ex rel. Brennan v. Bowman,* 89 Nev. 330, 512 P.2d 1321 (1973); *Opinion of the Justices,* 359 Mass. 769, 268 N.E.2d 149 (1971); *Fickes v. Missoula Co.,* 155 Mont. 258, 470 P.2d 287 (1970).

▆ For the reasons discussed above, the expenditure of public funds for pollution control projects at private facilities is constitutionally permissible because it serves a public purpose.

4. *The Expenditures Of Public Funds For The Installation Of Equipment For Conservation Of Energy And For Production For Sale Of Equipment For Conservation Of Energy Is For A Public Purpose.*

▆ The Act provides for two types of energy financing programs—the energy loan program and the energy loan insurance program. Minn.Stat. §§ 116J.925–116J.926. The energy financing programs authorized by the Act serve a public purpose since they will benefit the community, energy conservation is a proper government concern, and undue private benefit will not result.

Energy conservation and development of alternative energy have become important concerns of Minnesota citizens. The reason for the great concern to the State of Minnesota is that the energy used in Minnesota is almost entirely imported. Therefore, cost effective investments in energy conservation will have the effect of increasing the total amount of Minnesota's financial resources for all other types of investments. Energy conservation is, in principle, the same as energy production, and achieving cost-effective energy conservation in Minnesota is the same as producing energy at a cost per unit cheaper than the price per unit of imported energy.

As energy conservation and development of alternative energy resources involve new technology, there is little conventional financing available. Because conventional financing sources view energy conservation projects differently than business loans, even though they have parallel impacts on business profitability, investment opportunities are being foregone even though they would be cost effective. Because such energy conservation investments are being foregone, Minnesota is wasting valuable energy resources, and money is being spent on energy which would be available for other types of investments within the state.

Defendant argues that the benefits from the North Atlantic project are too speculative because there is no requirement that heat exchangers be installed in Minnesota. While Minn.Stat. § 116J.924 does not require that the qualified energy projects be installed in the State, the rules promulgated by the plaintiff provide that projects will only be approved if they are economically advantageous to the State, facilitate a reliable source of energy to Minnesota and diminish Minnesota's reliance on imported energy. 4 MCAR § 14.073. As illustrated by this project, plaintiff will evaluate the impacts from the projects before insuring the loan. In this case, the benefits to Minnesota are clear as North Atlantic uses Minnesota subcontractors, and the proceeds of the loan are expected to finance projects primarily in Minnesota and the surrounding states. Furthermore, courts have found a public purpose even though most of the benefit goes out of state. *Square Butte Electric Cooperative v. Hilken,* 244 N.W.2d 519 (N.D.1976) (approving condemnation for a power line even though most power will go out of state); *Adams v. Greenwich Water Co.,* 138 Conn. 205, 83 A.2d 177 (1977) (approving eminent domain for reservoir which will also benefits citizens of another state). Similarly, the Minnesota Supreme Court approved the purchase by the state of a building and equipment to lease it to a private company as serving the public purpose of providing a market for area agricultural products and alleviating unemployment, even though there was no requirement that Minnesota products be used. *Chun King*

*Sales, Inc. v. County of St. Louis,* 256 Minn. 375, 98 N.W.2d 194 (1959).

 The energy needs of the people of Minnesota are a proper governmental concern. The energy financing programs established by the Act are but one of several steps taken by the Legislature in reaction to the growing concern about Minnesota's dependence on imported energy.

While there have been no Minnesota cases specifically addressing the use of public funds for the development of energy conservation and alternative energy resources by providing financial assistance to private facilities, Minnesota has long approved the issuance of revenue bonds for municipal utilities. *Williams v. Village of Kenyon,* 187 Minn. 161, 244 N.W. 558, 561 (1932). Since energy conservation is in principle the same as energy production, the longstanding recognition of energy production as a valid public purpose is persuasive. Additionally, the interest and concern of the state in conserving energy is very much like the interest and concern of the citizenry of the State of Minnesota in preventing pollution, recognized by the Minnesota Supreme Court in *Minnesota Pollution Control Agency v. Hatfield,* 294 Minn. at 265, 200 N.W.2d at 575.

Energy conservation and alternative energy development have been held to be a public purpose in all but one of five cases considering the question. *Nicoll v. City of Eugene,* 52 Or.App. 379, 628 P.2d 1213 (1981); *Douglas v. Judge,* 174 Mont. 32, 568 P.2d 530 (1977); *State ex rel. Douglas v. Thone,* 204 Neb. 836, 286 N.W.2d 249, 252–254 (1979); In *Idaho Water Resource Board v. Kramer,* 97 Idaho 535, 548 P.2d 35 (1976). The only case which found no public purpose in an energy related project is *State ex rel. McLeod v. Riley,* 276 S.C. 323, 278 S.E.2d 612 (1981). In *Riley,* the South Carolina Supreme Court invalidated a statute permitting the issuance of general obligation bonds to finance an alcohol fuel development loan program. The court found that any public benefit from such a program was too indirect and speculative to pass constitutional muster. 278 S.E.2d at 615. The Court's rationale in *Riley* is much like that of the minority cases finding industrial revenue bonds not for a public purpose because the public benefit was found to be indirect. The Minnesota Supreme Court has consistently rejected such a narrow approach to a determination of public purpose, *City of Pipestone v. Madsen,* 287 Minn. 357, 178 N.W.2d 594 (1970), and, indeed, has held that a public purpose exists even if a private corporation "will receive a large benefit." *Id.* 287 Minn. at 373, 178 N.W.2d at 603.

Accordingly, the Court follows the liberal approach to public purpose of the Minnesota Supreme Court and the majority trend of cases from other jurisdictions and finds that energy conservation and the development of alternative energy constitutes a public purpose.

5. *Plaintiff Will Not Be A Party In Carrying On Works Of Internal Improvement Under The Business Loan, Pollution Control Loan Or Energy Loan Programs.*

Article XI, Section 3 of the Minnesota Constitution [6] provides that the State of Minnesota "shall not be a party in carrying on works of internal improvements except as authorized by this constitution." This prohibition has always been given a strict construction by the Minnesota Supreme Court.

The Minnesota Supreme Court has generally limited the application of the internal improvements clause by broadly construing those activities which constitute "legitimate governmental functions," which were never intended to fall within the constitutional prohibition. Based upon its broad interpretation of those activities which constitute a proper function of State government, the Court has, in numerous decisions in recent years, refused to strike down acts

---

**6.** Prior to the amendment and restructuring of the Minnesota Constitution on November 5, 1974, the prohibition against works of internal improvement appeared in Article IX, Section 5, of the Constitution of 1857, as amended, and is referred to as such in the pre-1974 cases.

of the Legislature on the ground that they made the State a party to a work of internal improvement. In so doing, the Court has determined that if the internal improvements clause is not to present a continuing obstacle to the Legislature and its attempt to respond to public needs, the constitution must be read to permit the State to engage in those activities which are a proper function of State government.

In *Visina v. Freeman*, 252 Minn. 177, 193–94, 89 N.W.2d 635, 648–49 (1958) (citations omitted), the Court observed that in determining what constitutes a proper governmental function, the Constitution must be interpreted in light of contemporary conditions:

> While the plain meaning of language used in our fundamental law may not be tampered with to accomplish a desired result no matter how archaic it has become by virtue of social and economic changes which have occurred since its adoption, neither should the proper interpretation of constitutional provisions ignore such changes. In determining whether an act of the legislature contravenes a constitutional provision, we should endeavor to interpret the provision in the light of existing conditions, particularly when those conditions could not have been foreseen at the time the Constitution was adopted. If the Great Lakes-St. Lawrence Seaway had been a reality instead of a dream when our Constitution was adopted, it can hardly be supposed that the framers of our Constitution, and the people who adopted it, would have proscribed the expenditure of public money to improve harbor and dock facilities to enable our State to have contact by water transportation with all other ports of the world. The limitation on spending public money for internal improvements obviously was not intended to circumscribe such activity. In a true sense, the development of a seaport to facilitate water transportation between our state and other parts of the world is not an internal improvement at all. While we held that the term "internal improvements" includes any public im-

provement in *Rippe v. Becker*, it must be kept in mind, that in discussing the term, we did not dare have in mind any such thing as the development of a seaport. It seems to us that such improvement could not have been within the contemplated meaning of this constitutional proscription, nor would it be proper to so construe the Constitution as to include it within the meaning of "internal improvements."

Accordingly, although the Court in *Rippe v. Becker*, 56 Minn. 100, 57 N.W. 331 (1894), had specifically stated that the internal improvements clause was intended to restrain State government in the improvement of rivers and harbors, the Court in *Visina* found no barrier to development of a seaport at Duluth.

The Court in *Visina* also observed:

> While this case may illustrate the need for some constitutional revision, the fact remains that the right to amend the Constitution rests with the people and should not be usurped by the courts in the guise of judicial interpretation. At the same time, when it becomes necessary to interpret the provisions of the Constitution in the light of conditions which exist today that could not be contemplated at the time our Constitution was adopted, we should attempt to give it a reasonable meaning as applied to present conditions if that can be done without doing violence to the express language used in the Constitution itself. If the language of the Constitution permits, we should give it that meaning which would have been expressed when adopted if the present conditions that are involved had then existed or had been within the contemplation of those who drafted the instrument.

252 Minn. at 194, 89 N.W.2d at 649.

In *Minn. Pollution Control Agency v. Hatfield*, 294 Minn. 260, 200 N.W.2d 572 (1972), the Court affirmed its holding in *Visina* that the internal improvements prohibition must be interpreted in light of cur-

rent notions of what constitutes a proper function of state government:

> Pollution of our air and waters has now become one of the chief concerns of our citizenry. It must be generally conceded that alleviation of pollution in our water ... involves the preservation of the public health as well as the public welfare, and as such it constitutes a governmental function for which the expenditure of public money does not contravene [the constitutional provision] prohibiting the expenditure of such funds for internal improvements.

294 Minn. at 265, 200 N.W.2d at 575. In *Minnesota Housing Finance Agency v. Hatfield,* 297 Minn. 155, 210 N.W.2d 298 (1972), the Court, after observing that the internal improvements clause has, historically, been given a fairly limited reading, again affirmed its holding in *Visina* that the "categories of allowable and forbidden state activities are not static." 297 Minn. at 164, 210 N.W.2d at 304. The Court noted that since its earliest decisions, it had upheld a variety of legislative enactments as accepted governmental functions which were not prohibited as works of internal improvements. Acting consistently, it upheld a plan to provide the financing of housing for persons of low and moderate income as a proper function of State government.

 The purposes for which plaintiff has adopted its business loan, pollution control, and two energy loan programs are set forth in detail in the Findings of Fact. Both the Legislature and plaintiff have concluded that the accomplishment of these purposes constitutes a proper function of State government. Since these purposes are proper for the expenditure of public money, it follows that they are proper functions of State government and that their accomplishment should not be frustrated by the prohibition against carrying on works of internal improvement.[7]

Here, the defendant has introduced no evidence in support of his position that the development of programs and approval of loan and insurance applications by plaintiff do not constitute a proper function of government. Defendant has failed to meet the heavy burden of demonstrating beyond a reasonable doubt that the statute, programs, or projects are constitutionally infirm.

### 6. *The Issuance Of Bond Insurance And Loan Insurance By Plaintiff Does Not Create Public Debt.*

The purposes for which "public debt may be contracted" are limited by article XI of the Minnesota Constitution. The manner in which, and the purposes for which, the State may contract public debt are set forth in article XI, §§ 4–7. "Public debt" is defined in article XI, § 4, which provides:

> The public debt includes any obligation payable directly in whole or in part from a tax of statewide application on any class of property, income, transaction or privilege, but does not include any obligation which is payable from revenues other than taxes.

In *Minnesota Housing Finance Agency v. Hatfield,* the Court held that the bonds and notes were not

> "payable directly, in whole or in part, from a tax of State-wide application" but solely from the revenues paid by the owners of the projects MHFA finances. The statute sets out detailed requirements for the establishment of bond and loan funds which are to be used to repay the loans and specifically states that the bonds are not debts or liabilities of the state. Additionally, the specific notes at

---

7. In *Visina v. Freeman,* 252 Minn. 177, 184, 89 N.W.2d 635, 643, the Court noted that the concepts of "public purpose" and "proper governmental function" are closely related:

> What is a "public purpose" that will justify the expenditure of public money is not capable of a precise definition, but the Courts generally construe it to mean such an activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government.

This definition of public purpose was cited by the Court with approval in *City of Pipestone v. Madsen,* 287 Minn. 357, 364, 178 N.W.2d 594, 599 (1970).

issue state on their face that the bonds are repayable "solely from the South High Construction Loan Account" and are not debts of the state. 297 Minn. 163, 210 N.W.2d at 303. In reaching its decision, the Court relied on prior Minnesota decisions upholding the constitutionality of bonds to be paid solely out of special funds, *Williams v. Village of Kenyon,* 187 Minn. 161, 244 N.W. 558 (1932) (bonds to be paid out of income from a generating plant); *Fanning v. University of Minnesota,* 183 Minn. 222, 236 N.W. 217 (1931) (bonds to be paid solely out of earnings of a University dormitory). Additionally, the Court noted that "[o]ther states have consistently held that revenue bonds which specifically deny any liability of the state do not constitute state debt within the meaning of provisions similar to Minn. Const. art. IX, §§ 6 and 7." [8] *Minnesota Housing Finance Agency v. Hatfield,* 297 Minn. at 163, 210 N.W.2d at 303.

The Minnesota Supreme Court has also applied the special fund doctrine to uphold the constitutionality of bonds, even when the bonds were to be repaid out of a fund derived from the levy and collection of a tax which was specifically authorized for that purpose. *Visina v. Freeman,* 252 Minn. 177 at 189, 89 N.W.2d 635 at 652 (construction of terminal and port facilities from special tax in aid of port development); *Naftalin v. King,* 257 Minn. 498, 499–502, 102 N.W.2d 301, 302–04 (construction of state institutions paid out of proceeds of tax on homesteads); *Lifteau v. Metropolitan Sports Facility Commission,* 270 N.W.2d at 755 (construction of stadium to be paid out of revenues from stadium and from special metropolitan tax).

Nowhere in the Act is there any language which would even imply that the bond insurance or loan insurance is to be repaid out of future state-wide appropriations. Indeed, the Act contains an explicit provision that is virtually identical to the language found in the municipal revenue bond statute, Minn.Stat. ch. 474 and the housing finance agency statute, Minn.Stat. ch. 462A, which provides:

> Neither the state nor any other agency or political subdivision of the state shall be liable on any bond, note or other obligation of the agency, and no bond, note or other obligation of the agency shall constitute a debt or loan of credit of the state or any political subdivision or any individual member of the agency.

Minn.Stat. § 116J.89, subd. 3 (1982). Additionally, Minn.Stat. § 116J.91, subd. 12 (Supp.1983) provides that bonds are to be paid solely from the particular monies, assets or revenues derived from its programs or from specific reserve funds which have previously been pledged for the bonds.

There is nothing in the Act that would require plaintiff to provide for the bond insurance or loan insurance out of anything other than revenues derived from its loan programs or the special accounts created out of already appropriated funds. Moreover, a careful review of the resolutions of plaintiff, the memoranda of agreement and the participating lenders agreement clearly indicates that the specific bonds, bond insurance and loan insurance are to be repayable solely out of proceeds from the loans or, in the event of default, from the special insurance accounts created out of already segregated funds. Here, the bond insurance and loan insurance are not funded out of future appropriations. Instead, they are funded from money that has already been appropriated by the Legislature. Thus, the evil of pledging the future credit of the state is simply not present in this case.

Moreover, this analysis is supported by cases from other jurisdictions. The general rule is that an obligation for which an appropriation is made at the time of its creation from funds already in existence is not within the operation of a limitation on public debt clause. 72 Am.Jur.2d States § 81. In *Witzenburger v. Wyoming Community Development Authority,* 575 P.2d

---

**8.** The Minnesota Constitution was revised for structure and form in 1973. At that time the provisions relating to public debt in what was then article IX, §§ 6 and 7 were restructured and were placed in article XI, §§ 4 through 7.

1100, 1132–35 (Wyo.1978), the Wyoming Supreme Court held that no debt was created because the community development authority bonds at issue were payable only from current appropriations and did not create a debt in excess of money already appropriated. 575 P.2d at 1133. Both Rhode Island and Pennsylvania have upheld appropriations to fund reserve accounts for housing finance agencies even if there is a mandatory requirement that that appropriation be included in the governor's budget. *Opinion to the Governor,* 112 R.I. 151, 308 A.2d 809 (1973); *Johnson v. Pennsylvania Housing Finance Agency,* 453 Pa. 329, 309 A.2d 528 (1973). Courts have consistently held that there is no public debt created when the legislature is permitted, but not required, to make appropriations to the agency.[9] The Michigan Supreme Court upheld a provision providing for voluntary appropriations as not being a public debt and stated that if in future an actual appropriation was made it would not alter the status of the bonds as revenue bonds and would not make them a public debt. *In Re Advisory Opinion re the Constitutionality of P.A. 1975 Number Abbreviated 301,* 400 Mich. 270, 254 N.W.2d 528, 535 (1977).

Finally, the Maryland Supreme Court struck down a program for insuring payment of mortgages on the grounds that it created a public debt. However, in so holding the court noted:

> Had Maryland chosen to fund the guarantee by appropriations to the authority, no problem would have arisen. It was the pledge of the State's credit to support the Authority's guarantee of loans indefinite in duration and uncertain in amount, to be made in aid of private industry for the repayment of which the counties and municipalities themselves are not responsible, which was fatal.

*Maryland Industrial Development Finance Authority v. Helfrich,* 250 Md. 602, 243 A.2d 869, 879 (1968). *Accord, State ex rel. Douglas v. Thone,* 204 Neb. 836, 286 N.W.2d 249 (1979). While there are cases to the contrary, *e.g., Casey v. South Carolina State Housing Authority,* 264 S.C. 303, 215 S.E.2d 184 (1975), they represent a minority view.

■ The bond insurance and loan insurance programs of plaintiff do not suffer the fatal flaw of pledging future appropriations. The bond insurance and loan insurance are specifically restricted to payment from revenues of plaintiff and from already appropriated funds which have been placed in segregated accounts. Accordingly, it must be concluded that the bond insurance and loan insurance programs of the authority do not create a public debt within the meaning of the state constitution.

7. *The Bond Insurance and Loan Insurance Which Plaintiff is Empowered to Issue Does Not Constitute an Impermissible Pledge of the Credit of the State.*

■ The bond insurance and loan insurance funds are not violative of article 11, § 2 of the Minnesota Constitution which provides:

> The credit of the state shall not be given or loaned in aid of any individual, association or corporation except as hereinafter provided.

The Minnesota Supreme Court has consistently construed this provision as not prohibiting the lending of the credit of the state in aid of an individual or corporation if it is done primarily for a public purpose. *E.g., Minnesota Housing Finance Agency v. Hatfield,* 297 Minn. 155, 210 N.W.2d 298 (1973); *City of Pipestone v. Madsen,* 287 Minn. 357, 178 N.W.2d 594 (1970); *Visina*

---

**9.** *Infants v. Virginia Housing and Development Authority,* 221 Va. 659, 272 S.E.2d 649 (1980); *In re Interrogatories by Colorado Senate,* 193 Colo. 298, 566 P.2d 350 (1977); *John R. Grubb, Inc. v. Iowa Housing Finance Authority,* 255 N.W.2d 89 (Iowa 1977); *In re the Constitutionality of ORS, 465.720,* 272 Or. 398, 537 P.2d 542 (1975); *Opinion of the Justices to House of Representatives,* 368 Mass. 880, 335 N.E.2d 362 (1975); *Maine State Housing Authority v. Depositors Trust Co.,* 278 A.2d 699 (Me.1971); *Maryland Industrial Development Finance Authority v. Meadow-Croft,* 243 Md. 515, 221 A.2d 632 (1966).

*v. Freeman*, 252 Minn. 177, 89 N.W.2d 635 (1958). As discussed at length in this memorandum, the expenditures challenged are for a public purpose and, thus, are constitutional pursuant to the Minnesota Supreme Court's longstanding construction of the lending of the credit of the state clause.

This Court will not depart from the Minnesota Supreme Court's prior analysis and adopt Maine's interpretation of its similarly worded constitutional prohibition against lending the credit of the state to private individuals. In *Common Cause v. State of Maine*, 455 A.2d 1 (Me.1983), the Maine Supreme Court construed the credit clause to only bar suretyship debts. *Id.* at 28. The Maine Supreme Court looked to the historical basis for the credit clause and stated that the purpose of the clause was "to remove this delusion of suretyship with its snare of temptation". Even if the interpretation of the Maine Supreme Court were adopted, the clause would not be violated since the State is not placing itself in the position of providing bond insurance or loan insurance from future state-wide tax revenues.

This case does not present unrestricted pledges to insure bonds or insure loans out of future tax revenues. Instead, this case deals with limited insurance of bonds and loans from already appropriated funds which are kept in segregated accounts. It is clear from the Act, the structure of the bonds, agreements, and loans in question that future tax appropriations are not required to be used to insure the bonds or loans in question.

 Whether the expenditures of public funds for bond insurance and loan insurance programs are "good" or "bad" from a policy standpoint is a question for the Legislature not this Court. The following discussion in the Minnesota Supreme Court's recent decision in upholding the domed stadium bonds is illuminating:

We are not persuaded by plaintiff's argument that the law is bad because it benefits indirectly some private individuals or

corporations; that it is economically unsound; that stadia all over the country have experienced cost overruns; and that the new stadium, if built, will prove to be a "loser" from a revenue standpoint. These arguments are proper arguments to be made to the legislature, or to the Commission itself. It might very well prove to be the case that the revenues from a new stadium, from the admissions tax and from the 2 percent tax on liquor, will be insufficient to pay for both bond principal and interest and for the operations and administrative expenses. But this is a gamble that the bond holders will have to be prepared to take. Decisions such as these are economic matters and political decisions to be made by legislative bodies, not the courts.

*Lifteau v. Metropolitan Sports Facilities Commission*, 270 N.W.2d 749, 755 (1978).

The bond insurance and loan insurance programs of the plaintiff are not an unconstitutional lending of credit of the state since they are for a public purpose and do not create a public debt.

8. *The Act Does Not Unduly Delegate Legislative Power To Plaintiff.*

The leading Minnesota case on delegation by the legislative branch to a state administrative agency is *Lee v. Delmont*, 228 Minn. 101, 36 N.W.2d 530 (1949). In upholding the constitutionality of a barber's licensing statute in *Lee* the Court observed:

The policy of the law and the standard of action to guide the administrative agencies may be laid down in very broad and general terms. What is a sufficiently definite declaration of policy and standard obviously varies in some degree according to the complexity of the subject to which the law is applicable. The discretionary power to ascertain the operative facts normally carries with it the power to make rules and regulations pursuant to which the power is exercised.[10]

**10.** 228 Minn. at 114, 36 N.W.2d at 539 (citations

and footnotes omitted) (emphasis added). The

The Minnesota decisions since *Lee* have consistently followed the principle that adequate statutory standards may be laid down in broad and general terms. Under this principle, the Minnesota Supreme Court has consistently upheld state legislation against a challenge of unconstitutional delegation of legislative power.[11] In a series of decisions, the Court has upheld delegations of legislative power to the Metropolitan Airports Commission (*State ex rel. Interstate Air-Parts, Inc. v. Minneapolis-St. Paul Metropolitan Airports Comm'n*, 223 Minn. 175, 188–91, 25 N.W.2d 718, 727–28 (1947)), a local housing and redevelopment authority (*Thomas v. Housing & Redevelopment Authority of Duluth*, 234 Minn. 221, 247–50, 48 N.W.2d 175, 192 (1951)), a seaway port authority (*Visina v. Freeman*, 252 Minn. 177, 199–200, 89 N.W.2d 635, 652–53 (1958)), the Commissioner of Highways (*Anderson v. Comm'r of Highways*, 267 Minn. 308, 311–14, 126 N.W.2d 778, 780–83 (1964) (determining whether an individual was a "habitual violator" of the traffic laws)), and the PCA (*Minnesota Pollution Control Agency v. Hatfield*, 294 Minn. 260, 266–67, 200 N.W.2d 572, 576 (1972)).[12]

The primary authority relied upon by defendant to support his argument that the Act unconstitutionally delegates legislative power to the authority, *Douglas v. Judge*, 174 Mont. 32, 568 P.2d 530, 535 (1977), is distinguishable. The statute under review in *Douglas* authorized a state agency to make renewable resource development loans to farmers and ranchers. Although the statute was upheld on "public purpose" grounds, the Court found that the legislative direction that loans be made "for any worthwhile project" failed to provide a sufficient standard or direction to the agency as to the approval of loan applications. In the statute under review, the legislative standards are far more restrictive than the "worthwhile project" language which *Douglas* held to be inadequate. The Court noted that two other grant and loan programs, wherein the Legislature retained authority to approve grants and loans, involved no unconstitutional delegation. 568 P.2d at 534–35.

■ Regardless whether or not our Supreme Court would follow the *Douglas* decision in an identical case,[13] it is clear to this Court that in a complex area it is necessary and appropriate for the legislature to delegate in broad and general terms.

■ Nor are the Act's provisions relating to energy loan insurance and energy development loans defective for lack of ad-

court specifically observed that in a complex area, an adequate statutory standard might consist of a direction that the agency act "in the public interest." 228 Minn. at 114 n. 12, 36 N.W.2d at 539 n. 11.

11. Defendant cites no Minnesota decisions, either before or after *Lee*, which invalidated a delegation of legislative power to a state administrative agency. *Wallace v. Commissioner of Taxation* (discussed *infra*) involved a claim that a statute improperly delegated the taxing power to an outside agency, the federal government. In addition, the *Wallace* case was decided upon statutory construction rather than constitutional grounds.

12. The Court's decision in *State ex rel. Foster v. City of Minneapolis*, 255 Minn. 249, 97 N.W.2d 273 (1959), which invalidated a delegation of legislative power to private property owners in connection with their zoning rights, did not involve a delegation to a state agency and apparently was based upon 14th amendment due process rather than separation of powers considera-

tions. *Id.* at 253, 97 N.W.2d at 275. *Accord, Remington Arms Co. v. G.E.M. of St. Louis, Inc.*, 257 Minn. 562, 102 N.W.2d 528 (1960) (delegation without hearing or standards to private parties of power to set prices under fair trade law is unconstitutional).

13. The modern view of the delegation doctrine is that clear legislative standards are no longer required to avoid an unconstitutional delegation where the rights of the public are protected against an abuse of administrative power by (1) adequate "procedural safeguards" or (2) adequate "administrative standards," which have been established by the agency pursuant to a grant of rulemaking authority. 1 *K. Davis Administrative Law Treatise* §§ 3.14–3.15 (2d ed. 1978 & Supp.1982). *See, State ex rel. Douglas v. Nebraska Mortgage Fund*, 204 Neb. 445, 283 N.W.2d 12 (1979) (modern tendency is to permit delegation in light of complexity of economic and governmental conditions).

equate statutory standards. The legislative policy with respect to both of these energy-related programs is set forth in Minn.Stat. § 116J.921 (Supp.1983). The plaintiff's legislative mandate is to foster cooperation between government and the private sector of the economy to assure that Minnesota has available a reliable, economic supply of energy. Legislative intent with respect to what constitutes conservation, alternative energy resources, renewable energy resources, and energy recovery is specifically set forth in the definitional provisions of Minn.Stat. § 116J.922 (Supp. 1983). The Legislature further provided that plaintiff's powers be broadly interpreted "to facilitate innovative leadership in all areas of energy, including policy setting, goal definition, strategy planning, conservation, development of renewable and alternative energy resources, energy recovery, and monitoring." Minn.Stat. § 116J.923, subd. 3 (Supp.1983). In administering its energy programs the Authority, is specifically directed by the Act to focus on "job creation" and to accommodate the needs of low income families and persons. Minn.Stat. § 116J.923, subd. 5 (1983). Significantly, the Act also provides for close legislative monitoring of plaintiff's operations in the energy area by mandating planning, including planning as to appropriate reserve and guarantee fund levels, and by mandating annual reporting to the Legislature. Minn.Stat. § 116J.923, subd. 9 (Supp. 1983). Each of the Authority's energy programs is subject to the foregoing guidelines, standards and legislative supervision. In addition to these general standards, specific standards apply to the energy loan insurance program. The Act expressly authorizes plaintiff to establish eligibility requirements for insurance by rule, Minn. Stat. § 116J.924, subd. 3(b) (Supp.1983), and these standards are now in effect. 4 MCAR §§ 14.071–14.080.

█ It is acceptable for the Legislature to allow plaintiff to promulgate reasonable eligibility requirements by rule, rather than fixing them by statutory provision. These requirements are the kind of "details" which are properly delegated to an adminis-trative agency, particularly in a complex and fast-changing area where the purpose of the legislative program is to foster cooperation between government and lenders in the promotion of energy conservation. Similarly, the Legislature has established adequate standards in connection with the making of energy development loans.

The Legislature has not unconstitutionally delegated its authority by enacting the energy loan insurance and energy development loan programs.

### 9. The Act Does Not Unduly Delegate Legislative Power to the Federal Government.

█ Defendant also alleges that the economic development and pollution control loan provisions of the Act are defective because they unconstitutionally delegate the power to determine who may receive loans to an agency of the United States Government. Defendant's argument is based upon the provisions of Minn.Stat. § 116J.88, subd. 4 (Supp.1983) which defines "eligible small businesses," the class of applicants eligible for loans under Minn. Stat. § 116J.90 (Supp.1983). Defendant's objection is that the definition of eligible small business incorporates by reference the definition of small business contained in regulations of the United States small business administration, "as amended from time to time."

Defendant's attack on the definition of "eligible small business" relies upon *Wallace v. Commissioner of Taxation*, 289 Minn. 220, 184 N.W.2d 588 (1971). In *Wallace* the court held that a state tax law incorporating certain internal revenue code provisions should be interpreted to incorporate those provisions as of the date the state law was enacted and not as the provisions might be amended by Congress. The Court based its decision, in part, upon the express constitutional provision that: "The power of taxation shall never be surrendered, suspended or contracted away." Minn. Const. art. X, § 1.

In contrast to the tax exclusions under review in *Wallace*, which had a direct and immediate impact upon a Minnesota resident's tax liability, the definition of "eligible small business" does not directly determine which businesses will receive a loan from plaintiff. The ultimate determination as to whether to grant a business development or pollution control loan rests with plaintiff and not with the federal SBA. The definition of eligible small business merely specifies what "size standards" a business must meet in order to be eligible for a loan from plaintiff. In referencing federal regulations, the Legislature has adopted a generally accepted size standard to broadly define the category of eligible loan applicants.

In addition, the *Wallace* case itself notes an exception to its rule for statutes which "are auxillary in nature and seek to achieve uniformity in implementation of national programs and policies." 289 Minn. at 228, 184 N.W.2d at 592.[14] Here, although the Act is not "auxillary" to a federal statute, there are good reasons to coordinate federal and state eligibility requirements. The definition of small business contained in federal regulations is a generally accepted one, and is a definition which financial institutions and lenders commonly apply in the regular course of their business. Had the Legislature chosen to draft an entirely new set of size standards or to tie Minnesota's legislation to the federal size standards in effect at the time it was enacted, it would have created a confusing "double standard" for lenders which might have discouraged their participation in plaintiff's programs.

**14.** This principle was recently affirmed by the Court in *Minnesota Recipients Alliance v. Noot,* 313 N.W.2d 584, 586–87 (Minn.1981).